FILED
2026 Mar-02 PM 12:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHNNIE COLON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-01276-NAD |
| | ) | |
| B.L. HARBERT INTERNATIONAL, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below, the court **GRANTS** Defendant B.L. Harbert International, LLC's motion for summary judgment (Doc. 26).[1] The court separately will enter final judgment.

## BACKGROUND

### A.    Procedural background

On September 19, 2024, Plaintiff Johnnie Colon initiated this action by filing a *pro se* complaint against Defendant Harbert, alleging a violation of the Americans

---

[1] The parties have fully briefed this motion (Doc. 26), and the court has determined that this motion is appropriate for disposition on the briefs without oral argument. *See* Fed. R. Civ. P. 78(b); Doc. 27 (Defendant Harbert's moving brief); Doc. 28 (Harbert's evidentiary material); Doc. 34 (Plaintiff Colon's opposition and evidentiary material); Doc. 35 (Harbert's reply); *see also* Docs. 29, 30, 31, 32, 33 (briefing schedule and extensions).

1

with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §§ 12111–12117. Doc. 1 at 1, 8–9. The parties consented to magistrate judge jurisdiction. Doc. 14; 21 U.S.C. § 636(c); Fed. R. Civ. P. 73.

Colon's *pro se* complaint alleges a single claim for employment discrimination under the ADA based on Harbert's termination of his employment contract for a project in Beirut, Lebanon, after he repeatedly was absent and missed work on the project on account of several health conditions, including kidney stones. Doc. 1 at 3–7. The complaint alleges that Plaintiff Colon had "an actual or perceived disability," and that "Harbert removed Plaintiff from employment and sent him back to the U.S." because Colon "had an actual or perceived disability." Doc. 1 at 6–7.

On November 1, 2024, Harbert filed its answer. Doc. 9. And, after the close of discovery, Harbert filed this summary judgment motion. *See* Doc. 19 (scheduling order); Doc. 25 (revised scheduling order).

**B.    Factual background**

The relevant, record facts include the following: In August 2022, Harbert offered Colon a job as a mechanical superintendent on its U.S. Embassy project in Beirut. Doc. 28-1 at 10, 12, 95; Doc. 34-1 at 1. The Beirut project was time sensitive, and it was critical for the project to remain on schedule, which Colon understood. Doc. 28-4 at 3; Doc. 28-1 at 14.

On September 6, 2022, Colon arrived at the Beirut work site. Doc. 28-1 at

12.

At that time, Frank Bazan was Harbert's Director of the Mechanical Division. Doc. 28-2 at 5. Zack Carter was Harbert's Project Manager for the Beirut project, and Colon reported to Carter. Doc. 28-2 at 7. Tony Lau was Harbert's Finance and Admin Manager for the Beirut project. Doc. 28-2 at 8.

Colon was one of two mechanical superintendents on the project and had a crew of about 20 workers and a foreman. Doc. 28-1 at 12; Doc. 34-1 at 1–2. Colon was responsible for the HVAC systems in only one building. Doc. 34-1 at 1. According to Colon, his "job was to secure supplies for the crew, to relay tasks and assignments to the foreman, to coordinate with project engineering in charge of mechanical, to address problems as they arose, to visit the site to make certain the tasks were being performed as ordered, and to report progress to upper management." Doc. 34-1 at 2.

Colon was expected to work 60 hours or more per week on the Beirut project. Doc. 28-1 at 18; Doc. 34-1 at 2. Colon's employment contract and basic compensation on the Beirut project were "based on a work week of sixty (60) work hours or more per work week as directed by [Harbert]." Doc. 28-1 at 97.

Colon avers that he "did not have to be at the construction site every day" to perform his job functions, and that he relied on his foreman for "that direct daily oversight." Doc. 34-1 at 2–3.

But, in his deposition, Colon testified that his role "[d]efinitely" was "important," and that, "if [he] weren't there, somebody had to do the role that [he] would have been doing." Doc. 28-1 at 14. Colon also testified that it was "definitely" "important that there be a mechanical superintendent" to "perform the duties that were assigned to [him]," and that "it was important that that person be at work and able to perform the job." Doc. 28-1 at 21–22. Colon testified further that he "[d]efinitely" "understood that [Harbert] needed to have somebody who could be on the ground and able to walk the entire job site and supervise people on a day-to-day basis," but that "it was not like [he] had to be there on top of them every day." Doc. 28-1 at 22.

Colon avers that, on days that he missed work, his foreman, the other mechanical superintendent, the program manager, and the senior superintendent on the project were "available and capable to address any problems which might arise." Doc. 34-1 at 3.

From September 15, 2022, through September 17, 2022, Colon missed work due to back pain. Doc. 28-1 at 15; Doc. 28-5 at 3.

From September 22, 2022, through September 24, 2022, Colon again missed work; on September 22, Colon was diagnosed with kidney stones, and on the same day he tested positive for COVID-19 and had to quarantine. Doc. 28-1 at 15; Doc. 28-5 at 3, 6.

On September 28, 2022, Colon left work after lunch, and did not return that day.  Doc. 28-5 at 3, 6.  Colon missed work for three days from September 29, 2022, through October 1, 2022, for a stent procedure related to his kidney stones.  Doc. 28-5 at 3, 6; Doc. 28-1 at 16.  After that, Colon left work early on October 4, 2022, to pick up medication, and left work early on October 5, 2022, due to reported stomach issues.  Doc. 28-5 at 3, 6.

With respect to the kidney stones, a stent was placed, and Colon was prescribed painkillers.  Doc. 28-1 at 16.  The kidney stones did not resolve with the first stent, so in November 2022 Colon had a surgical procedure to attempt to address the issue.  Doc. 28-1 at 16.  A second stent also was placed, which caused continuing discomfort.  Doc. 28-1 at 16.  The second stent was removed on November 19, 2022, after which Colon "was good," and did not have any additional problems related to kidney stones.  Doc. 28-1 at 16, 29, 79.

While Colon was having health issues with the kidney stones, he was put on light duty with limited walking.  Doc. 28-1 at 19.  Colon avers that "at times" his "kidney impairment restricted his ability to walk great distances," but that he never had trouble accessing necessary parts of the work site because there were golf carts.  Doc. 34-1 at 3; *see* Doc. 28-1 at 14.

Carter avers that Colon "spent the majority of his working time in his office on his phone rather than out on the jobsite supervising the mechanical aspects of the

project," and that Carter "received complaints from several managerial employees on the Beirut Project that Mr. Colon appeared sleepy and not alert during meetings and was always on his phone."  Doc. 28-4 at 4.

On October 6, 2022 (while he was dealing with his kidney stones), Colon was a "no show at work."  Doc. 28-5 at 3, 6.  Lau had to send someone on a well check to find Colon and make sure that he was okay because Colon did not arrive at the work site on time and did not notify anyone that he would be late.  Doc. 28-1 at 17; Doc. 34-4 at 2, 10; Doc. 28-5 at 3.

Lau informed Carter and others by email he was "sending someone to [Colon's] residence," and that Colon had "been out 11 days since he mobilized" on the Beirut project "30 days ago" on September 6, 2022.  Doc. 34-4 at 2.  By email, Carter thanked Lau for the update, and replied, "let's see how this month goes." Doc. 34-4 at 2.

On that day when Colon was a "no show at work" (October 6, 2022), Colon was asleep at his residence because of issues with his pain medication.  Doc. 28-1 at 17.  While Colon was warned that another such incident would result in a write-up, Colon never was formally disciplined while on the Beirut project.  Doc. 28-1 at 17; Doc. 34-1 at 3–4; Doc. 34-4 at 2.

On October 7, 2022, Colon returned to work, but left for approximately five hours in the middle of the day.  Doc. 28-5 at 3, 6.

6

On October 12, 2022, Colon again missed work, due to reported kidney pain. Doc. 28-5 at 3–4, 6.  Colon worked less than two hours on October 13, 2022, and worked a half day on October 14, 2022, because of doctor's appointments.  Doc. 28-5 at 4, 6.

On October 15, 2022, Colon again missed work.  Doc. 28-5 at 4, 6.  Colon left work for two hours in the middle of the day on October 22, 2022, left an hour early on October 24, 2022, and did not return to work on October 28, 2022, after leaving in the middle of the day for a doctor's appointment.  Doc. 28-5 at 4, 7*; see also* Doc. 34-3 (Colon estimate of work hours).

On November 3, 2022, Lau sent another email to Carter and Bazan, documenting Colon's absences and missed work.  Doc. 34-4 at 4.  Lau stated that Colon had "missed a lot of time at work due to various medical issues (back issues/COVID/kidney stone/doctor checkups/medicine runs)," and that Lau "also had to give [Colon] a stern warning for not showing to work or leaving the site without informing [Lau] or [Colon's] supervisors."  Doc. 34-4 at 4.  Lau stated that he "believe[d] [Colon] does have some issues but it's been prolonged," and that it "may be better that he goes back to the US to take care of it?"  Doc. 34-4 at 4.  Lau also stated that Colon "currently has a bag/catheter like device attached to him due to lingering kidney stones.  His medical appointments ha[ve] gotten to a point where he had to create a WebEx group to let us know when he is coming and going for his

medical checkups." Doc. 34-4 at 4.

In the email, Lau stated that Colon "has been on site for 2 months and has exhausted all his sick days and has used 10.5 vacation days for further medical follow ups. This doesn't include the 1–2 hours every other time to go see the doctor for a follow up or to get medicine." Doc. 34-4 at 4. Lau then documented Colon's absences and missed work in a bulleted list and an attachment. Doc. 34-4 at 4.

In sum, for those two months on the Beirut project (from September 7, 2022, to November 3, 2022), Colon missed work for all or some of the day on 24 out of 47 work days. Doc. 34-1 at 4; Doc. 28-5 at 4. From September 7, 2022, to October 6, 2022, Colon missed 11 days of work. Doc. 34-4 at 2. As of November 3, 2022, Colon had used all 6 of his allotted sick days and 10.5 vacation days, Doc. 34-4 at 4; Doc. 34-1 at 4; *see* Doc. 28-1 at 11—even though vacation days accrued at a rate of only 2.5 days per month and, at most, Colon had access to only 30 days of paid vacation, Doc. 28-1 at 100.

Colon avers that from October 17, 2022, to November 3, 2022, he worked more than his required 60 hours per week. Doc. 34-1 at 5. Colon also avers that he never was told that the Beirut project was behind schedule due to his absences. Doc. 34-1 at 4.

Again, the record shows that from September 7, 2022, to November 3, 2022, Colon was expected to work 500 hours, but worked fewer than 300 hours—less than

two thirds of the time required.  Doc. 34-3 at 2–3; *see* Doc. 28-1 at 17.

Colon's absences continued into November 2022.  Doc. 28-5 at 4.  Colon testified that he did not think anyone ever talked to him about his absences.  Doc. 28-1 at 18.

Then, on November 16, 2022, Colon again missed work and failed to report without notice.  Doc. 28-5 at 4.  Lau called Colon, who indicated that he was out sick and trying to get a medical appointment for further treatment.  Doc. 28-5 at 4.

In another email to Carter on November 16, 2022, Lau informed Carter that Colon "is out sick today," that Colon "was trying to set up an appointment," and that Colon "didn't show for work today so I called him."  Doc. 34-4 at 10.  Lau stated in the email, "I also asked if [Colon] was going to come in today and he said 'was I supposed to come in today?'"  Doc. 34-4 at 10.

In response, Carter replied by email to Lau and others, "OK he needs to go." Doc. 34-4 at 9.[2]  Carter stated in the email that Colon "clearly is jeopardizing his own health by being here and he needs to get this addressed.  I would like to demob[iliz]e [Colon] ASAP."  Doc. 34-4 at 9.

Carter was the one who made the decision to terminate Colon.  Doc. 28-2 at 10.

---

[2] Carter's reply email is dated November 15, 2022, which appears to be on account of the geographic location and time difference for certain recipients.

According to Carter, in his time at Harbert, he "ha[s] never had an employee miss as much work as Mr. Colon did." Doc. 28-4 at 4.

Carter avers that, "[s]hortly after arriving in Beirut, Mr. Colon began missing an extensive amount of work," and that it is his "understanding that many of these absences were caused by various health concerns," but that he is "not aware of the particulars." Doc. 28-4 at 3. Carter also avers that "Colon never reported to [him] that he was substantially limited in his ability to work, and [Colon] never requested any accommodation." Doc. 28-4 at 3. Carter avers further that he understood Colon to "have had several relatively minor and treatable health situations that caused him to miss work." Doc. 28-4 at 3.

Carter also avers that Colon's work was "important to the project and to staying on schedule, and required [Colon] to work onsite approximately 60 hours per week." Doc. 28-4 at 3. Carter avers that, when Colon "did report to work," Colon "frequently failed to perform his job duties." Doc. 28-4 at 4.

Carter avers further that Colon's "excessive absences, failure to perform his job duties, and failure to communicate with others put at risk the progress of the Beirut Project." Doc. 28-4 at 4. Carter avers that the "unpredictable and sporadic nature of [Colon's] absences also left us unable to plan, as we never knew when Mr. Colon might be at work," and that Colon's "failure to report his absences as required also created uncertainty as well as a burden on those responsible for ensuring the

10

safety and wellbeing of [Harbert's] employees in Beirut." Doc. 28-4 at 4. Carter avers that, "[a]s a consequence of these issues, [Carter] decided on November 16, 2022, to terminate Mr. Colon's contract for the Beirut Project and demobilize him to the United States," and that Carter also "believed this would allow Mr. Colon to receive better medical treatment in the United States, allowing him to be cleared to return to work on another project." Doc. 28-4 at 4.

On December 3, 2022, Carter gave Colon notice that he was being removed from the Beirut project and sent back to the United States. Doc. 28-1 at 22; Doc. 34-4 at 11. Colon received half of one month's salary in lieu of two weeks' notice in writing. Doc. 28-1 at 22, 105, 117.

Colon was demobilized from the Beirut project, and given notice that he was "terminated for [Harbert's] convenience." Doc. 28-1 at 105, 117; Doc. 34-4 at 8.

On the same day (December 3, 2022), Carter wrote in an email to Bazan that Carter "gave [Colon] his notice today." Doc. 34-4 at 11. Carter stated in the email that he had told Colon that Colon "[has] been here for 2 months and it has not worked out," and that the Beirut project "can't afford to lose another 2 months." Doc. 34-4 at 11. Carter also stated that he told Colon that he was "concerned about the medical facilities here [in Beirut]" and "anything worse happening." Doc. 34-4 at 11. Carter wrote, "[Colon] said he was ready and willing to work and [Carter] told him sorry [it] has not worked out." Doc. 34-4 at 11. Carter also wrote in the email that he told

Colon that "it was bad luck," and that Colon "may have another opportunity with [Harbert]." Doc. 34-4 at 11.

In a reply email dated December 4, 2022, Bazan wrote to Carter and others that Colon "called [Bazan] yesterday and received the same message," and that Bazan "advised [Colon] to see his doctors stateside and obtain a full medical release before we can discuss another opportunity." Doc. 34-4 at 11.

Colon avers that, when he met with Carter on December 3, 2022, Carter said that Colon was being terminated because he "might get sick again and require future care." Doc. 34-1 at 5.

In his deposition testimony, when Colon was asked if he knew why he had been terminated from the Beirut project, he testified that it was "[b]ecause [he] was sick and [he] could not do his job like [he] was supposed to." Doc. 28-1 at 22.

When asked if he thought Carter made the decision to terminate him because he was "not performing the job to the standards [Carter] wanted them performed," Colon answered, "I think so, because I was sick." Doc. 28-1 at 33.

Carter told Colon that Harbert would find him another opportunity after he returned to the United States. Doc. 28-1 at 23, 31. Bazan then reached out to Harbert's domestic group about job availability for Colon. Doc. 28-2 at 10. Bazan advised Colon to get medical attention in the United States. Doc. 28-1 at 31; Doc. 34-4 at 11.

12

Colon then took a job with another company, Clayco, and worked for Clayco from January 4, 2023, until September 2024. Doc. 28-1 at 8, 24–26, 119; Doc. 34-4 at 14; Doc. 28-2 at 11.

Colon filed an EEOC charge alleging disability discrimination on March 7, 2023, which he later amended on July 21, 2023. Doc. 4-1; Doc. 4-2. On June 27, 2024, the EEOC issued Colon a notice of right to sue. Doc. 4-3.

Colon has not had any problems with kidney stones since the Beirut project, and had not had any problems with kidney stones before the Beirut project. Doc. 28-1 at 29. Colon testified that, if he had not been in Lebanon, his kidney stones likely could have been "taken care of in two weeks." Doc. 28-1 at 29. Colon acknowledged that his kidney stones were a "transient episode," not a "long-term health issue." Doc. 28-1 at 30.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] And a dispute

---

[3] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in the nonmovant's favor. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

Even construing the record evidence and all reasonable inferences in Colon's favor, as the court must at this stage (*see Centurion Air Cargo*, 420 F.3d at 1149), there still can be no genuine issue of material fact for trial because Colon cannot show that he is a "qualified individual" under the ADA,[4] on account of his

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

[4] Harbert's motion raises several other arguments for summary judgment that the

undisputed, repeated absences and missed work on the Beirut project.  *See* Fed. R. Civ. P. 56(a), (c); 42 U.S.C. § 12112.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.[5]  So, to prove a disability discrimination claim (on the plain language of the statute), the plaintiff must show that he "was a 'qualified individual' who suffered an adverse employment action because of [his] 'disability' as those terms are defined by the ADA."  *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019) (quoting *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1267–68 (11th Cir. 2014)).

Generally speaking, "[w]hen evaluating an ADA claim," the Eleventh Circuit uses "the same *McDonnell Douglas* burden-shifting framework that often applies in Title VII claims."  *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024). Under that familiar framework, a plaintiff can "establish a prima facie case of disability discrimination using circumstantial evidence," and the burden then "shifts to the employer to articulate a legitimate, non-discriminatory reason for its

---

court does not reach.  *See* Doc. 26.

[5] The parties do not dispute that Harbert is a covered entity under the ADA.

decision." *Id.* "An ADA plaintiff establishes a prima facie case by showing (1) [he] has a disability; (2) [he] is a qualified individual under the ADA; and (3) the employer discriminated against [him] 'on the basis of disability.'" *Id.*

Nevertheless, "a plaintiff will always survive summary judgment," if he can present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Akridge*, 93 F.4th at 1197 (quotation marks omitted). "[T]he inference to be drawn by a jury must be that the employee's disability was a but-for cause of the employer's intentional discrimination." *Id.*; *see also McCreight v. AuburnBank*, 117 F.4th 1322, 1340 (11th Cir. 2024) ("so long as a plaintiff offers enough evidence for a reasonable jury to infer illegal discrimination, [his] Title VII claim will survive summary judgment").[6]

Regardless, on the plain text of the ADA, Colon must show that there is a fact issue for trial on whether he is a "qualified individual." 42 U.S.C. § 12112. But, on the record facts in this case, no reasonable jury could find or infer that Colon was a qualified individual with respect to his termination from the Beirut project—i.e., the only alleged adverse employment action—given his repeated absences and missed work.

---

[6] The Eleventh Circuit applies the law developed in Title VII and ADA cases "interchangeably." *Bass v. Lockheed Martin Corp.*, 287 F. App'x 808, 810 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001)).

The ADA defines a "qualified individual" as "an individual who, [1] with or without reasonable accommodation, [2] can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).[7]

First (as a preliminary matter), there is no argument or evidence that Colon ever requested any accommodation on the Beirut project.  Doc. 28-1 at 33 (Colon deposition testimony); Doc. 28-4 at 3 (Carter's undisputed averment that Colon "never requested any accommodation"); Doc. 35 at 10 ("Plaintiff did not seek an accommodation for his alleged disability, but even if he had it is well established that an employer is not expected to allocate the essential functions of a role to other employees.").[8]

Second (by statute), with respect to the "essential functions of the employment position" for purposes of a plaintiff's required "qualified individual" showing under the ADA, "consideration shall be given to the employer's judgment as to what

---

[7] *Accord* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.").  *But see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("'[I]t is emphatically the province and duty of the judicial department to say what the law is.'" (quoting *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137, 177 (1803))).

[8] *See also* 42 U.S.C. § 12201(h) (a covered entity "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of [regarded-as] disability").

functions of a job are essential." 42 U.S.C. § 12111(8).

The essential functions of a position are the "fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *accord* 29 C.F.R. § 1630.2(n).

Ordinarily, "[d]etermining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001); *accord* 29 C.F.R. § 1630.2(n)(3).

In this regard, the Eleventh Circuit has recognized that in many cases "job presence"—e.g., regular attendance—"has been held to be an essential function of a job." *See Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1306 & n.8 (11th Cir. 2000) (collecting cases).

Here, no reasonable jury could find or infer that Colon "c[ould] perform the essential functions" of his mechanical superintendent position on the Beirut project, including regular attendance, given the undisputed record evidence that he continually was absent and missed work on the project. *See* 42 U.S.C. § 12111(8).

Giving "consideration" to Harbert's "judgment as to what functions of [the] job [we]re essential" (*see* 42 U.S.C. § 12111(8)), it is undisputed—i.e., Carter averred, and Colon testified in his deposition—that the Beirut project was time sensitive, and that it was critical for the work on the project to remain on schedule.

*See* Doc. 28-1 at 14; Doc. 28-4 at 3.

Likewise, it is undisputed that Colon's mechanical superintendent role was "important to the project and to staying on schedule." Doc. 28-4 at 3 (Carter averment). Colon himself testified in his deposition that his role "[d]efinitely" was "important," that it was "definitely" "important that there be a mechanical superintendent" to "perform the duties that were assigned to [him]," and that "it was important that that person be at work and able to perform the job." Doc. 28-1 at 21–22.

In particular, with respect to the required, regular attendance, it is undisputed that Colon was expected to work 60 hours or more per week on the Beirut project, and that his employment contract and basic compensation on the Beirut project were "based on a work week of sixty (60) work hours or more per work week as directed by [Harbert]." *See* Doc. 28-1 at 18, 97; Doc. 34-1 at 2; Doc. 28-4 at 3. Carter averred that Colon's work was "important to the project and to staying on schedule, and required [Colon] to work onsite approximately 60 hours per week" (Doc. 28-4 at 3), and that, when Colon "did report to work," Colon "frequently failed to perform his job duties" (Doc. 28-4 at 4). Carter also averred that Colon's "excessive absences, failure to perform his job duties, and failure to communicate with others put at risk the progress of the Beirut Project." Doc. 28-4 at 4.

It is undisputed that Carter was the one who made the decision to terminate

Colon. Doc. 28-2 at 10. Carter averred that, in his time at Harbert, he "ha[s] never had an employee miss as much work as Mr. Colon did" (Doc. 28-4 at 4); that averment also is undisputed.

Indeed, Colon himself testified in his deposition, when asked if he knew why he had been terminated from the Beirut project, that it was "[b]ecause [he] was sick and [he] could not do his job like [he] was supposed to." Doc. 28-1 at 22. And, when asked if he thought that Carter had made the decision to terminate him because he was "not performing the job to the standards [Carter] wanted them performed," Colon testified, "I think so, because I was sick." Doc. 28-1 at 33.

As explained above (*see supra* Factual background), it is undisputed that Colon repeatedly was absent and missed work on the Beirut project. For instance, in his first 30 days on the Beirut project (from September 7, 2022, to October 6, 2022), Colon missed all or some of 11 days of work. Doc. 34-4 at 2. And on October 6, 2022, Colon was a "no show at work," and Lau had to send someone on a well check to Colon's residence Doc. 28-5 at 3, 6; Doc. 28-1 at 17; Doc. 34-4 at 2, 10.

In his first two months on the Beirut project (from September 7, 2022, to November 3, 2022), Colon missed work for all or some of the day on 24 out of 47 work days. Doc. 34-1 at 4; Doc. 28-5 at 4.

Notwithstanding the contractual expectation that Colon would work 60 hours or more per work week, the undisputed record evidence shows that from September

7, 2022, to November 3, 2022, Colon was expected to work 500 hours, but worked fewer than 300 hours—less than two thirds of the time required.  Doc. 34-3 at 2–3; *see* Doc. 28-1 at 17.

By November 3, 2022, Colon had exhausted all of his allotted sick days (6 days), and—because his vacation days accrued at a rate of only 2.5 days per month—Colon also had exhausted even more vacation days (10.5 days) than he had accrued, without clear authorization.  *See* Doc. 34-4 at 4; Doc. 28-1 at 100.

It is undisputed that Colon's absences continued into November 2022 (Doc. 28-5 at 4), and that on November 16, 2022, Colon again missed work and failed to report without notice (Doc. 28-5 at 4).  In an email, Lau stated that, when he asked Colon "if [he] was going to come in today," Colon answered, "'[W]as I supposed to come in today?'"  Doc. 34-4 at 10.

Colon averred that, for the 14-day period from October 17, 2022, through November 3, 2022, he worked more than 144 hours for an average of more than 10 hours per day.  Doc. 34-1 at 5.  But, even in that timeframe, Colon worked more than 60 hours for only one work week (from October 17, 2022, to October 22, 2022). Doc. 34-3 at 3.

Colon testified and averred that he did not need to be at the job site every day (Doc. 34-1 at 2–3; Doc. 28-1 at 22), but he also testified that, "if [he] weren't there, somebody had to do the role that [he] would have been doing" (Doc. 28-1 at 14),

and that "[Harbert] needed to have somebody who could be on the ground and able to walk the entire job site and supervise people on a day-to-day basis" (Doc. 28-1 at 22).

Colon recognized in his deposition that at least part of his job was "visit[ing] the site to make certain the tasks were being performed as ordered." Doc. 34-1 at 2. And, the undisputed averment from Carter is that, even when Colon was present at the site, Carter "received complaints from several managerial employees on the Beirut Project that Mr. Colon appeared sleepy and not alert during meetings and was always on his phone." Doc. 28-4 at 4.

Colon also averred that other workers, including the foreman who reported to him and other supervisors, could fill in for him when he was absent or missed work. Doc. 34-1 at 3. But Carter has provided undisputed averments that Colon's "excessive absences, failure to perform his job duties, and failure to communicate with others . . . left us in the position of essentially having to operate with only one Mechanical Superintendent . . . and led to complaints to me from other managers on the Beirut Project." Doc. 28-4 at 4.

Colon has identified evidence that he never was formally disciplined while on the Beirut project (Doc. 28-1 at 17; Doc. 34-1 at 3–4; Doc. 34-4 at 2), that no one at Harbert told him his absences were excessive (Doc. 28-1 at 18), and that no one at Harbert told him the Beirut project was behind schedule (Doc. 34-1 at 4). But none

22

of those facts changes the undisputed record evidence of Colon's repeated absences and missed work.  Because Colon failed to satisfy the presence requirement of his job, no reasonable jury could find or infer that he could "perform the essential functions" of that job (*see* 42 U.S.C. § 12111(8)), regardless whether Colon was formally disciplined or advised that his absences were excessive.  Tellingly, after terminating Colon from the Beirut project, Carter stated in an email that he had told Colon that Colon "[has] been here for 2 months and it has not worked out," and that the Beirut project "can't afford to lose another 2 months."  Doc. 34-4 at 11; *see* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential").

In sum, because the undisputed record evidence is that Colon did not meet the attendance requirement of his job, no reasonable jury could find or infer that he could "perform the essential functions" of his job (*see* 42 U.S.C. § 12111(8)).  Consequently, Colon cannot show that there is a fact issue for trial on the question whether he is a "qualified individual" (42 U.S.C. § 12112), and Harbert is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, Harbert's summary judgment motion (Doc. 26) is **GRANTED**.  Colon's single ADA claim is **DISMISSED WITH PREJUDICE**.

Separately, the court will enter final judgment.

**DONE** and **ORDERED** this March 2, 2026.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE